UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANDREW PELLEGRINO,

                Plaintiff,

        -v-               1:20-CV-484

FIRST UNUM LIFE
INSURANCE COMPANY,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:            OF COUNSEL:

MARC WHITEHEAD        MADISON T. DONALDSON, ESQ.
  & ASSOCIATES, LLP
Attorneys for Plaintiff
403 Heights Boulevard
Houston, TX 77007

ROBINSON, COLE LAW FIRM    GREGORY J. BENNICI, ESQ.
Attorneys for Defendant       PATRICK W. BEGOS, ESQ.
1055 Washington Boulevard
Stamford, CT 06901

DAVID N. HURD
United States District Judge

# **TABLE OF CONTENTS**

**I.  INTRODUCTION**...................................................................... **3**

**II.  BACKGROUND** ...................................................................... **3**

**III.  FINDINGS OF FACT** ............................................................ **5**

   A.  The Initial Injury ........................................................................5

   B.  Plaintiff Receives STD Benefits ................................................6

   C.  Symptoms Do Not Improve........................................................6

   D.  Plaintiff Undergoes Steroid Injections......................................7

   E.  STD Benefits Expire ..................................................................9

   F.  First Unum Gathers Evidence for an LTD Claim .................. 10

   G.  LTD Benefits Begin................................................................ 12

   H.  First Unum Dispatches a Representative ............................. 13

   I.  The First IME......................................................................... 15

   J.  LTD Benefits are Approved.................................................... 16

   K.  LTD Benefits Continue.......................................................... 18

   L.  The Second IME ..................................................................... 20

   M.  LTD Benefits are Terminated............................................... 21

**IV.  LEGAL STANDARD** ............................................................ **22**

**V.  CONCLUSIONS OF LAW** ..................................................... **24**

**VI.  CONCLUSION**...................................................................... **31**

## MEMORANDUM-DECISION and ORDER

## I.  INTRODUCTION

On April 27, 2020, plaintiff Andrew Pellegrino ("Pellegrino" or "plaintiff") filed this action alleging that defendant First Unum Life Insurance Company ("First Unum" or "defendant") violated the Employee Retirement Income Security Act of 1974 ("ERISA") by terminating his disability benefits.

On December 30, 2020, the parties agreed to resolve this dispute with a bench trial on a stipulated paper record pursuant to Rule 52 of the Federal Rules of Civil Procedure.  The matter has been fully briefed and will be decided on the basis of the submissions without oral argument.

## II.  BACKGROUND

In July of 2012, FlexTrade Systems, Inc. ("FlexTrade"), a financial technology firm headquartered in Great Neck, New York, hired Pellegrino as a network engineer.  AR at 269.[1]  Flextrade covered plaintiff with an employee benefit plan (the "Plan") administered by First Unum that offered short- and long-term disability benefits.  *See id*.

---

[1] Citations to "AR" refer to the stipulated record, "which encompasses documents Bates numbered Pellegrino v. Unum_0001 through Pellegrino v. Unum_1977, and a video file that is 4:21 in length."  Dkt. No. 16 ¶ 2.  The parties filed a copy of the video clip under seal on a USB drive, which is maintained on file in the Clerk's Office.  *See* Dkt. No. 30.  The parties also submitted to chambers a non-redacted copy of the stipulated paper record.  An electronic copy of that record is also filed under seal on CM/ECF.  *See* Dkt. No. 31–34.

On September 2, 2012, Pellegrino suffered a back injury while working around his house. AR at 338. Plaintiff submitted a claim to First Unum for short-term disability ("STD") benefits under the Plan. *Id*. at 483–84, 52–53. Defendant approved plaintiff's claim. *Id*. at 12.

On March 4, 2013, Pellegrino's STD benefits expired. AR at 339. First Unum transferred plaintiff's claim file to its long-term disability ("LTD") benefits division to evaluate whether plaintiff qualified as "disabled" under the LTD provisions of the Plan. *Id*. Defendant eventually approved plaintiff's LTD claim. *Id*. at 343, 996.

On April 19, 2018, after gathering additional evidence over a period of several years, First Unum notified Pellegrino that he no longer qualified for benefits because his condition had improved to a sufficient extent that he was no longer "disabled" under the applicable terms of the Plan. AR at 1687.

On October 16, 2018, Pellegrino administratively appealed First Unum's decision to terminate his LTD benefits. AR at 1728–43. After an internal review, defendant adhered to its determination that plaintiff was no longer disabled. *Id*. at 1941–49. Defendant notified plaintiff of the determination in a letter dated February 18, 2019. *Id*. This action followed.

## III.  **FINDINGS OF FACT**[2]

Pellegrino's network engineer job is categorized as a "light" level physical demand occupation.  AR at 2–3, 318, 726.  Light work duty includes the ability to (1) engage in physical exertion with up to twenty pounds of weight; (2) occasionally push, pull, walk, stand, stoop, and reach in all directions, and (3) frequently sit, finger, and keyboard.  *Id*. at 643.

### A.  **The Initial Injury**

On September 2, 2012, Pellegrino was removing some air conditioners from the windows of his house and moving them to his garage for seasonal storage when he "thr[ew] his back out."  AR at 338, 478, 483.  Plaintiff drove himself to a local hospital the next day.  *Id*. at 158, 484.  He was seen by emergency room staff, who took x-rays and sent him home with instructions to rest.  *Id*. at 484.

On September 4, 2012, Pellegrino notified FlexTrade that he would not be able to come to work because of his recent back injury.  AR at 483–84.  About a week later, plaintiff visited Darryl Antonacci, M.D., an orthopedic spine surgeon, for an initial consultation.  *Id*. at 245.  Dr. Antonacci examined

---

[2]  The section constitutes the findings of fact, which are based on the parties' stipulated record.  FED. R. CIV. P. 52(a)(1)("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").  To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

plaintiff and diagnosed him with a possible disc herniation.  *Id*.  Dr.

Antonacci ordered a magnetic resonance imaging ("MRI") scan of plaintiff's

lumbar spine and prescribed him Relafen, an anti-inflammatory drug.  *Id*.

## B.  Plaintiff Receives STD Benefits

On September 18, 2012, Pellegrino submitted a claim to First Unum for

STD benefits under the Plan.  AR at 52–53.  This claim was supported by a

medical opinion from Dr. Antonacci, who recommended that plaintiff refrain

from "heavy lifting, bending, twisting, [or] sitting for prolonged time."  *Id*. at

53.  Defendant approved plaintiff's claim.  *See id*. at 12, 339–340.

On September 26, 2012, Pellegrino followed up with Dr. Antonacci to get

the MRI results.  AR at 78.  Dr. Antonacci reviewed the MRI with plaintiff

and noted that it "demonstrates bulging and [a] slightly herniated disk at

L4-5 and L5-S1" with "mild annular tears at both those levels."  *Id*.  Dr.

Antonacci prescribed plaintiff some Naprosyn, a different anti-inflammatory

drug, and recommended that he follow up with Sanjay Bakshi, M.D., a pain

management physician, if the symptoms did not improve in a few weeks.  *Id*.

## C.  Symptoms Do Not Improve

On November 5, 2012, Pellegrino met with Dr. Bakshi for a new patient

consultation.  AR at 75–77.  According to Dr. Bakshi's notes, plaintiff

described his pain as occurring in the "mid to right-sided lower back with

radiation to the right hip, bilateral groin down the right lower extremity to

the foot" that caused numbness, tingling, and weakness on his right side.  *Id*.
at 75.  Plaintiff also reported that his current pain level was "constant" at "9"
out of 10.  *Id*.  Dr. Bakshi examined plaintiff and diagnosed him with a
lumbar disc herniation and lumbar radiculopathy and recommended that he
undergo a "transforaminal injection" to help alleviate the pain and other
symptoms.  *Id*. at 77.

On November 7, 2012, Dr. Antonacci submitted to First Unum an
"Estimated Functional Abilities Form" to substantiate Pellegrino's ongoing
restrictions and limitations.  AR at 73–74.  In Dr. Antonacci's opinion,
plaintiff was at that time (1) unable to stoop, crouch, or push/pull/lift/carry
more than ten pounds; (2) able to occasionally sit, stand, walk, kneel, crawl,
climb stairs, reach above and below his shoulder, and operate foot controls;
(3) able to continuously perform handling, fingering, and keyboarding
tasks.  *Id*.  Dr. Antonacci's report explained that these restrictions and
limitations were caused by "an acute herniated disc" that resulted in "lumbar
radiculopathy."  *Id*. at 74.  Dr. Antonacci further advised that plaintiff was
scheduled to undergo "epidural steroid injection[s]" and that, unless plaintiff
had a positive response, he might need "surgical intervention."  *Id*.

## D.  **Plaintiff Undergoes Steroid Injections**

On November 28, 2012, Dr. Bakshi injected Pellegrino's lumbar spinal
region with a dose of steroids.  AR at 90.  At a follow-up visit a few weeks

later, plaintiff reported that this injection "helped him approximately 10% for four to five days" before the pain returned. *Id*. at 182. According to plaintiff, his pain remained "constant" at a "7 to 8" out of 10. *Id*. Dr. Bakshi suggested that plaintiff consider a surgical consult, but plaintiff declined. *Id*. at 183. Dr. Bakshi then suggested a second course of steroid injections. *Id*.

On January 9, 2013, Dr. Bakshi injected Pellegrino with another dose of steroids. AR at 185. At a follow-up visit, plaintiff reported to Dr. Bakshi that this round of injections made him feel "50% better," but that he still felt "residual lower back pain with radiation to the right groin down to the posterior aspect of the right lower extremity to the knee." *Id*. at 187. He also reported that he was no longer "using any pain medications." *Id*. According to plaintiff, his pain still remained "constant" at a "4" out of 10. *Id*. Dr. Bakshi recommended another course of steroid injections. *Id*. at 188.

On February 13, 2013, Dr. Bakshi injected Pellegrino with a third dose of steroids. AR at 190. At a follow-up visit a short time later, plaintiff reported to Gerard Abrahamsen, PA-C, Dr. Bakshi's Physician's Assistant, that the most recent injections made him feel "40% to 50% better," but that he still has "residual lower back pain with radiation to the right groin and the right lower extremity." *Id*. at 550. According to plaintiff, his pain level remained "constant" at "4" out of 10. *Id*.

During this March 4, 2013 follow-up visit, Pellegrino told PA Abrahamsen that "he is going to attempt to start back to work at this point." AR at 551. PA Abrahamsen recommended no further steroid injections or other treatment at that time. *Id.* Instead, PA Abrahamsen advised plaintiff to follow up with Dr. Bakshi or his primary care physician as needed. *Id.*

**E. STD Benefits Expire**

Because Pellegrino's STD benefits expired in March of 2013, First Unum transferred plaintiff's claim file to its LTD benefits division to evaluate whether plaintiff could qualify as "disabled" under the LTD provisions of the Plan. AR at 339. As relevant here, defendant "has discretionary authority to determine [a claimant's] eligibility for benefits and to interpret the terms and provisions of the [Plan]." *Id.* at 101.

Under the LTD component of the Plan:

> You are disabled when Unum determines that:
>
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any

> gainful occupation[3] for which you are reasonably fitted
> by education, training or experience.

AR at 106 (emphases omitted).

On March 7, 2013, a First Unum representative telephoned Pellegrino to discuss his LTD benefits claim. AR at 157–62. During that conversation, plaintiff recounted the history of his back injury and explained that he had undergone a series of steroid injections that helped reduce the pain and other symptoms. *Id*. Plaintiff informed defendant's representative that he also has prescriptions for various anti-inflammatory drugs but tries not to take them, and in fact had not taken them in about a week. *Id*. at 159. Plaintiff also discussed his activities in a typical day, reported that his pain on a "good day" was about a "3–4" out of 10 and on a "bad day" was about "7–8 or so" out of 10. *Id*. at 158–59. According to the written report of this telephone call, plaintiff "stated he is thinking of looking at other occupations" but "didn't want to lose coverage if [defendant] knew he was looking for employment." *Id*. at 157, 162.

## F. First Unum Gathers Evidence for an LTD Claim

Following this initial telephone call, First Unum began to work up the file on Pellegrino's LTD benefits claim. Defendant sent out informational

---

[3] The Plan defines "gainful occupation" as an occupation "that is or can be expected to provide you with an income within 12 months of your return to work that exceeds" (1) "80% of your indexed monthly earnings, if you are working;" or (2) "60% of your indexed monthly earnings, if you are not working." AR at 125.

requests to plaintiff's doctors.  AR at 257, 354.  Dr. Antonacci responded on

April 10, 2013, and reported that plaintiff retained the physical capacity to

perform the physical demands of his previous job as a "network engineer" on

a full-time basis.  *Id*. at 257.  Dr. Bakshi's office was less responsive, but after

a series of telephone calls someone in his office eventually told defendant that

plaintiff "has not been seen for a long time" and that Dr. Bakshi "would need

to re-evaluate" plaintiff before completing any written assessment of his

current physical capacity.  *Id*. at 315.

First Unum also asked Bryan S. Hauser, M.D., one of its medical

consultant, to review Pellegrino's claim file to determine whether plaintiff

could still perform "light work."  AR at 318.  Dr. Hauser reviewed the file

and, *inter alia*, noted that plaintiff's failure to follow up with Dr. Bakshi or

any other treatment provider after his third round of steroid injections was

"not consistent with ongoing severe symptoms."  *Id*. at 319.

Based on this observation and a review of the rest of the claim file, Dr.

Hauser concluded that although it is reasonable to believe that Pellegrino

was initially unable to work for about six weeks following his back injury,

there was "insufficient medical information" in the record to support any

ongoing physical restrictions that would preclude him from returning to light

work.  AR at 319.

On August 7, 2013, Pellegrino followed up with Dr. Bakshi.  AR at 386.
Dr. Bakshi's written treatment note indicates that plaintiff reported his pain
was starting to return.  *Id*.  This treatment note further indicates that
plaintiff "has not undergone a surgical evaluation due to his lack of health
coverage" and that he "cannot use [anti-inflammatory drugs] due to GI
distress."  *Id*.  According to plaintiff, his pain level was "constant" at a "7 to 8"
out of 10.  *Id*.  Upon physical examination, Dr. Bakshi opined that Pellegrino
might eventually need more steroid injections but that it was "too early" to
make that determination.  *Id*. at 387.  Dr. Bakshi further opined that he did
"not feel that the patient is capable of working at this point."  *Id*.

On August 9, 2013, Dr. Bakshi completed a work capacity evaluation form
that First Unum had sent to his office earlier that year.  AR at 354–55.  Dr.
Bakshi reported that he did not believe Pellegrino could perform the physical
demands of his job as a network engineer on a full-time basis.  *Id*.  Instead,
Dr. Bakshi reported that he had advised plaintiff to "refrain from lifting,
bending, pushing, pulling, and twisting" and that plaintiff "may require spine
surgery."  *Id*.

## G.  **LTD Benefits Begin**

That same day, First Unum sent Pellegrino a letter notifying him that it
not yet made a final decision about his eligibility for LTD benefits but that it

would begin sending him payments "under a Reservation of Rights" while it completes a review of his claim.  AR at 343–49.

On October 3, 2013, Dr. Hauser, First Unum's medical consultant, reviewed new material provided by Dr. Bakshi after Pellegrino's most recent office visit.  AR at 421.  Dr. Hauser noted that the "available medical information supports that the claimant has pain attributable to lumbar radiculopathy."  *Id*.  However, Dr. Hauser concluded that it was unclear that the pain was sufficiently severe to preclude the physical demands of work as a network engineer.  *Id*.  Accordingly, Dr. Hauser recommended a personal visit with, and direct observation of, plaintiff.  *Id*.

## H.  <u>First Unum Dispatches a Representative</u>

On October 16, 2013, First Unum sent a field representative named Tessa Goldstein out to meet with Pellegrino at his home.  AR at 468–89.  During his visit with Ms. Goldstein, plaintiff reported that "his pain is permanently at a six on a one to ten pain scale," but that it will often "become a ten and is usually precipitated by sitting or standing for too long."  *Id*. at 485.  Notably, Ms. Goldstein observed that plaintiff "did not appear to be in acute pain" and "remained [seated] for the duration of the interview," which lasted for two hours and fifteen minutes.  *Id*. at 478, 480.

On November 15, 2013, Dr. Hauser, First Unum's medical consultant, reviewed the new material in Pellegrino's claim file that included a visit note

from Dr. Bakshi and the field visit report from Ms. Goldstein.  AR at 564–65.

Dr. Hauser observed that the conservative treatment plaintiff continued to

receive was inconsistent with the severity of his self-reported pain.  *Id*. at

564.  Dr. Hauser concluded that although plaintiff still suffered from physical

"deficits," those limitations were "not of sufficient severity to preclude the

demands" of work as a network engineer.  *Id*.

On November 20, 2013, Dr. Hauser wrote to Dr. Bakshi to request

additional information about Pellegrino's limitations.  AR at 568–70.  In

response, Dr. Bakshi stated that plaintiff could not perform light work on a

full-time basis because a recent examination showed pain inhibited

tenderness in his right lower extremity, antalgic gait, a decreased range of

motion with flexion, extension, lateral bending and a positive straight leg

raise on his right side at 45 degrees."  *Id*.  Dr. Bakshi opined that plaintiff

should still refrain from lifting or carrying because his right leg could give

out.  *Id*.  According to Dr. Bakshi, these findings were supported by the prior

diagnostic testing from 2012.  *Id*.  Dr. Bakshi stated that plaintiff would need

a spinal fusion before he could return to light work.  *Id*.

On December 20, 2013, Dr. Hauser conducted a fourth review of

Pellegrino's claim file.  AR at 607–13.  Although Dr. Hauser acknowledged

that the medical evidence supported a finding that plaintiff was unable to

work from the time of his injury (September of 2012) to the present, there

were gaps of time in the medical record where plaintiff was not receiving any treatment. *Id*. Accordingly, Dr. Hauser recommended that First Unum refer plaintiff's benefits claim to a Designated Medical Officer ("DMO") for a second opinion. *Id*. at 613. Defendant referred the file to G. Lance Matheny, M.D., a board certified orthopedic surgeon, who reviewed the evidence and concurred with Dr. Hauser's opinion. *Id*. at 625.

On December 18, 2013, Dr. Bakshi injected Pellegrino with a new round of steroids. AR at 813. At a follow-up visit a few weeks later, plaintiff reported that his pain improved for "approximately one week" but that "his condition is getting worse." *Id*. at 814. Plaintiff reported his pain was "constant" at a "7" out of 10. *Id*. Dr. Bakshi's treatment note also stated that plaintiff has "not explored" surgery because he does not have insurance coverage. *Id*.

## I. **The First IME**

On January 21, 2014, First Unum referred Pellegrino for an Independent Medical Examination ("IME") with Arnold Schwartz, M.D., a board certified orthopedic surgeon, to determine whether plaintiff could perform the physical demands of light work. AR at 777–78. After several delays and a change in location, Dr. Schwartz examined plaintiff on March 31, 2014. *Id*. at 929–31. As relevant here, Dr. Schwartz reported that:

> Despite all of the above [treatment] and multiple visit
> to physical therapy and injections and visits, it is my
> opinion at this time that this gentleman has a problem

> with his right hip.  There were no imaging studies to
> identify the source of the pain in his right hip . . . . I
> think he needs full workup of his right hip region.

AR at 930–31.  Dr. Schwartz further opined that plaintiff retained the

functional capacity for *sedentary* work, but not for the light work required of

his regular occupation as a network engineer.  *Id.*  Dr. Hauser reviewed Dr.

Schwartz's report and agreed with his assessment.  *Id.* at 1002.

### J.  <u>LTD Benefits are Approved</u>

On May 5, 2014, First Unum notified Pellegrino that it had approved his

LTD benefits claim and removed the reservation of rights that was applicable

to the prior payments.  AR at 996–97.  The letter explained that this

determination was based on Dr. Schwartz's findings of restrictions and

limitations.  *Id.*  This letter also cautioned Pellegrino that the Plan's

definition of "disability" would become more demanding on March 4, 2015,

after an initial twenty-four months of LTD benefits were paid out.  *Id.*

As the letter explained, the initial disability determination hinged on

whether the claimant could perform the duties of his "regular occupation";

*i.e.*, his job as a network engineer.  AR at 996–97.  After twenty-four months,

however, the disability determination broadened to the question of whether

the claimant could perform the duties of "any gainful occupation" for which

they were "reasonably fitted by education, training or experience."  *Id.*

On June 30, 2014, Pellegrino followed up with Dr. Bakshi.  AR at 1093. The treatment note reflects that plaintiff continued to "complain of lower back pain with radiation to the right buttock down to the right lower extremity" and "a clicking in the right hip."  *Id*.  Plaintiff reported his pain was constant at a "7 to 8" out of 10.  *Id*.  Dr. Bakshi also noted that plaintiff "has not yet seen the hip surgeon" because of "some insurance issues."  *Id*. Plaintiff visited Dr. Bakshi several more times in 2014 for prescription refills, but each time reported that he could not see a surgeon or undergo physical therapy because he lacked insurance coverage.  *Id*. at 1096, 1099, 1102.

On January 14, 2015, Dr. Bakshi returned a certification to First Unum in which he reported that Pellegrino was still unable to (1) lift, carry, push, or pull 10 pounds occasionally or (2) perform "mostly seated work" that may involve standing or walking for brief periods of time even if it allowed for the ability to change positions at a work station.  AR at 1070–71.

On February 4, 2015, in preparation for the change in the applicable definition of "disability" under the Plan, First Unum conducted a vocational review of Pellegrino's claim file to determine whether there were any gainful occupations that plaintiff retained the functional capacity to perform.  AR at 1117–18.  Notably, this review was based upon plaintiff's work history as a "network systems administrator" from 1999–2012.  *Id*. at 1117.  This review identified "help desk representative" as an alternate gainful occupation that

plaintiff was qualified to perform.  *Id*. at 1118.  However, this occupation did not pay enough to meet other components of the Plan's requirement.  *Id*.

### K.  **LTD Benefits Continue**

Consequently, on March 3, 2015, First Unum notified Pellegrino that it had approved his continued receipt of LTD benefits beyond the initial twenty-four month period.  AR at 1143.  This letter explained that, based on the vocational review performed by defendant, plaintiff satisfied even the more demanding standard of "disability" that applied under the Plan.  *Id*.

On October 14, 2015, Pellegrino telephoned First Unum to inform defendant that he had obtained health insurance through Medicaid.  AR at 1183.  Plaintiff also began treating with Suelane Do Ouro, M.D., a different pain management physician.  *Id*. at 1905.  Dr. Do Ouro ordered MRIs of plaintiff's right hip and lumbar spine in March of 2016.  *Id*. at 1905–06.  As Dr. Schwartz had previously predicted, plaintiff's hip MRI revealed advanced osteoarthritis and a torn labrum.  *Id*. at 1905.  By contrast, the lumbar MRI revealed only a "small disc bulge" with "slightly right-sided disc herniation."  *Id*. at 1906.  A treatment note from July 11, 2016 advised plaintiff to "consider a right Total Hip Replacement."  *Id*. at 1904.

On July 26, 2016, Dr. Do Ouro completed a disability status update requested by First Unum.  AR at 1221–23.  According to Dr. Do Ouro, Pellegrino was unable to handle any prolonged sitting, standing, or walking

and should avoid lifting more than 20 pounds, bending forward, crouching, kneeling, crawling, or pushing/pulling more than 5 pounds. *Id*. Dr. Do Ouro indicated she could not opine how long these restrictions would last, but indicated that she would continue to monitor and re-evaluate. *Id*. at 1222.

On February 21, 2017, Pellegrino visited with Asya Gutman, PA and expressed interest in Orthovisc injections, a medication used to treat pain from osteoarthritis. AR at 1439. A few weeks later, on March 8, Dr. Do Ouro injected plaintiff with epidural steroids in his lumbar region. *Id*. at 1442. Later that summer, Dr. Do Ouro also delivered a series of three injections to plaintiff's right hip joint with Orthovisc. *Id*. at 1445, 1451, 1409. Plaintiff reported "good relief from those injections." *Id*. at 1411.

On August 24, 2017, First Unum wrote to Dr. Do Ouro requesting information about Pellegrino's current work capacity. AR at 1452. The letter asked Dr. Do Ouro to consider whether plaintiff could perform the demands of "light work" on a full-time basis. *Id*. Dr. Do Ouro responded "no," and explained that plaintiff has "a history of chronic pain syndrome." *Id*.

On November 21, 2017, First Unum decided to conduct surveillance of Pellegrino in an effort to get more information about his current work capacity and physical limitations. AR at 1382–90. An investigator observed plaintiff enter and exit his car, walk around New York City, and carry some

plastic grocery bags into his house.  *Id*. at 1384.  According to defendant, this

investigative effort provided "minimal information."  *Id*. at 1419.

### L.  The Second IME

On March 1, 2018, First Unum referred Pellegrino for a second IME, this

time with Philip D'Ambrosio, M.D., another board-certified orthopedic

surgeon.  AR at 1652.  Based upon a physical examination and a review of the

medical record, Dr. D'Ambrosio diagnosed plaintiff with resolved lumbosacral

strain/sprain and osteoarthritis of the right hip.  *Id*. at 1657.  Dr. D'Ambrosio

also observed that plaintiff's disc herniation had improved with time but that

plaintiff's ongoing problem "is related to the right hip and not to the

lumbosacral spine."  *Id*. at 1658.

Dr. D'Ambrosio opined that Pellegrino retained the functional capacity to

lift, carry, push, and pull up to 20 pounds, could occasionally push, pull, walk,

stand, stoop, reach upwards and downward, and handle, and could frequently

sit, finger, and use a keyboard.  AR at 1657.  Based on this functional

capacity, First Unum determined that plaintiff could perform light work on a

full-time basis.  *Id*. at 1677.

On March 8, 2018, First Unum wrote to Dr. Do Ouro to inform her of the

IME completed by Dr. D'Ambrosio and to ask whether or not she agreed with

the limitations he assessed.  AR at 1664.  Despite several calls to her office in

March and a follow-up letter in April, Dr. Do Ouro did not respond to defendant's request.  *Id*. at 1666–67, 1673–74.

**M.  LTD Benefits are Terminated**

On April 19, 2018, First Unum notified Pellegrino that he no longer qualified for LTD benefits because the information in the claim file (and in particular Dr. D'Ambrosio's latest medical opinion) indicated he could once again perform the duties of his own occupation; *i.e.*, light work on a full-time basis.  AR at 1687.

On October 16, 2018, Pellegrino administratively appealed First Unum's decision terminating his LTD benefits.  AR at 1728–43.  As part of his appeal, plaintiff submitted additional treatment notes from three recent visits with Dr. Do Ouro.  *Id*. at 1780–96.

On October 18, 2018, First Unum referred Pellegrino's claim file to Scott B. Norris, M.D., for additional review.  AR at 1800–04.  Although Dr. Norris recognized that plaintiff continued to suffer some physical impairments as a result of his ongoing right hip condition, Dr. Norris ultimately concluded that plaintiff still retained the capacity to perform light work on a full-time basis.  *Id*. at 1927–28.

On January 24, 2019, First Unum also conducted a vocational file review of Pellegrino's claim file to determine whether the restrictions and limitations

identified by Dr. Norris would preclude plaintiff from performing alternative occupations that met the gainful wage requirement.  AR at 1934.

This vocational review concluded that plaintiff could engage in several different gainful occupations at the sedentary level, including help desk analyst and help desk representative.  AR at 1935.  Notably, this vocational review also concluded that plaintiff could still perform his regular occupation as a network system engineer with a reasonable accommodation.  *Id*.

On February 18, 2019, First Unum notified Pellegrino that it had reviewed its termination of his LTD benefits and concluded that it correctly determined that plaintiff is no longer disabled under the terms of the Plan.  AR at 1941–49.

## IV.  LEGAL STANDARD

A beneficiary of an ERISA plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  The plan participant bears the burden of demonstrating by a preponderance of the evidence an entitlement to benefits.[4]  *See, e.g.*, *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 765 (2d

---

[4] This remains true even if, as here, the plaintiff received benefits for a period of time. *Baird v. Prudential Ins. Co.*, 2010 WL 374839, at *10 n.4 (S.D.N.Y. Sept. 24, 2010) (collecting cases), *aff'd*, 458 F. App'x 39 (2d Cir. 2012) (summary order).

Cir. 2002) ("[A]s a matter of general insurance law, the insured has the burden of proving that a benefit is covered[.]").

Although "ERISA itself does not define the standard of review applicable to such actions," *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996), the Supreme Court has explained "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

As set forth *supra* in the findings of fact, the Court concludes that the written Plan documents confer on First Unum the discretionary authority to determine eligibility for benefits. *See* AR at 101. Where, as here, "the plan confers upon the administrator discretionary authority to construe the terms of the plan, a reviewing court should examine the administrator's decision under an abuse of discretion standard." *Rood v. N.Y. State Teamsters Conf. Pension & Ret. Fund*, 39 F. Supp. 3d 241, 248 (N.D.N.Y. 2014) (Kahn, J.). "Under such a standard, an administrator abuses its discretion only when the administrator's actions are arbitrary and capricious." *Id*.

"A decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Franzese v. United Health Care/Oxford*, 232 F. Supp. 3d 267, 275 (E.D.N.Y. 2017) (cleaned

up).  "Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (cleaned up).

The scope of this review is relatively narrow.  *See Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83–84 (2d Cir. 2009).  Courts are not free to substitute their own judgment for that of the insurer or the administrator.  *Id.*  Even so, "[a]pplying a deferential standard of review to the administrator's decision does not mean the administrator will prevail on the merits."  *Rood*, 39 F. Supp. 3d at 249.  "It means only that the administrator's interpretation of the plan will not be disturbed if reasonable."  *Id.* (cleaned up).

Finally, courts must also take into account the conflict of interest that arises where, as here, the defendant appears to play the dual role as administrator of the plan and payor of claims.  *See, e.g., Meidl v. Aetna, Inc.*, 346 F. Supp. 3d 223, 233–34 (D. Conn. 2018).  Although this factor does not change the applicable standard of review, the court "must take [the conflict] into account and weigh [it] as a factor in determining whether there was an abuse of discretion."  *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008).

## V.  <u>CONCLUSIONS OF LAW</u>

Pellegrino, for his part, contends that First Unum acted in an arbitrary and capricious manner by cherry-picking evidence from the record "that

justified denying the Plaintiff further benefits." Pl.'s Mem., Dkt. No. 18-1 at 9.[5] According to plaintiff, defendant's termination of his LTD benefits relies on "flawed opinions which are based upon mere file reviews and blatantly contradict Plaintiff's own treating physicians." *Id*. at 13.

First Unum, for its part, contends that it appropriately re-evaluated Pellegrino's functional restrictions and limitations on a periodic basis in accordance with the terms of the Plan and acted reasonably in eventually concluding that plaintiff's "functional capacity improved[ ] once he was correctly diagnosed and treated" for osteoarthritis in his right hip. Def.'s Mem., Dkt. No. 19 at 20–24. According to defendant, this discretionary conclusion is supported by "numerous independent peer reviews and independent medical examinations" in the record. *Id*. at 26.

As an initial matter, both parties acknowledge that Pellegrino suffered significant pain and limitations from his initial back injury in September of 2012, and that his course of pain management treatment with Dr. Bakshi, which included a series of steroid injections, was of relatively limited effectiveness in reducing those symptoms. The evidence also clearly supports the conclusion that plaintiff continues to suffer some degree of pain and limitation from his osteoarthritic hip and lower back problems. Indeed,

---

[5] Pagination corresponds to CM/ECF.

defendant's various medical consultants—including independent medical examiners Dr. Schwartz and Dr. D'Ambrosio—recognized as much.

Even so, the mere fact that Pellegrino has been diagnosed with certain prior or ongoing health conditions does not itself establish continued disability under the LTD component of the Plan.  Instead, the relevant question (after the initial twenty-four month period) is whether plaintiff's functional capacity continues to broadly preclude him from "performing the duties of *any* gainful occupation" for which he is "reasonably fitted by education, training or experience."

To that end, the evidence in the record establishes that Pellegrino eventually pursued a course of treatment that provided more meaningful relief than the steroid injections offered by Dr. Bakshi in late 2012 and early 2013 or the prescription anti-inflammatories Dr. Bakshi provided throughout 2014.

Notably, at the 2014 IME, Dr. Schwartz suggested that Pellegrino's right hip was the likely underlying source of his pain and other symptoms.  In late 2015, plaintiff began treating with Dr. Do Ouro, who reached broadly the same conclusion as Dr. Schwartz.  Thereafter, Dr. Do Ouro focused plaintiff's continued treatment on the osteoarthritis in his hip.  This treatment included a series of Orthovisc injections for which plaintiff reported receiving "good

relief." Plaintiff's treatment with Dr. Do Ouro continued throughout 2016 and 2017.

By March of 2018, when First Unum finally referred Pellegrino for a second IME to evaluate his ongoing functional restrictions and limitations, Dr. D'Ambrosio observed that plaintiff's ongoing problem "is related to the right hip and not to the lumbosacral spine." And after a physical examination and a review of the rest of the claim file including Dr. Do Ouro's treatment notes, Dr. D'Ambrosio opined that plaintiff retained the functional capacity necessary to perform the demands of light work on a full-time basis.

Because Pellegrino's prior job as a network engineer was classified as "light" work, it was reasonable for First Unum to rely on Dr. D'Ambrosio's opinion as well as other substantial evidence to conclude that plaintiff was no longer "disabled" under the LTD provisions of the Plan; *i.e.*, he was no longer precluded from performing "the material and substantial duties" of his "regular occupation" as a network engineer.

Pellegrino accuses First Unum of reaching this conclusion by relying on the "false assertion" that his condition improved. Pl.'s Response, Dkt. No. 25 at 2. According to plaintiff, his pain levels actually *increased* over time. *Id*. Plaintiff insists that the only reason he engaged in a so-called "conservative" treatment regimen with his various treating providers is because he lacked steady access to health insurance. *Id*. at 3, 7. In opposition, defendant

contends there is "a plethora of other evidence, including objective evidence, undercutting Plaintiff's complaints" of subjective, self-reported pain.  Def.'s Response, Dkt. No. 26 at 11.

Upon review, First Unum has the better of this argument.  To be sure, "the subjective element of pain is an important factor to be considered in determining disability."  *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 317 (S.D.N.Y. 2009) (citation omitted).  "Although plan administrators adjudicating claims involving such inherently subjective disorders [or subjective symptoms]—and, in turn, courts reviewing challenges to denials of those claims—are not required to take such assertions of incapacity at face value, they may not dismiss them out of hand without adequate attention to the claimant's complaints."  *Valentine v. Aetna Life Ins. Co.*, 125 F. Supp. 3d 425, 440 (E.D.N.Y. 2015).

First, it bears noting that even Dr. Do Ouro—Pellegrino's treating provider—characterized her approach to plaintiff's treatment for his hip condition as generally "conservative" in nature.  For instance, her treatment notes repeatedly state that hip pain can often be treated "with conservative interventions like directed physical therapy, NSAIDs, and cortisone injections."  Although at one point another physician did advise plaintiff to consider a "total hip replacement," AR at 1904, he continued to receive the "conservative" treatment modalities (*e.g.*, injections and anti-inflammatories)

offered by Dr. Do Ouro.[6]   Second, and equally important, the record reflects

that defendant's medical consultants and medical examiners all considered

plaintiff's subjective reports of severely limiting pain before determining that

the objective evidence in the record did not fully support them.

The Second Circuit has explained that "it is arbitrary and capricious to

disregard evidence simply because it is subjective." *Miles v. Principal Life

Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013).  But that does not mean the plan

administrator has to accept without question the degree to which an

individual's subjective experience of pain limits their objective functional

capacity.

In this case, First Unum considered the evidence from Dr. Do Ouro but

ultimately chose to rely on Dr. D'Ambrosio's opinion (which followed a

physical exam) and Dr. Norris's findings (which were based on a review of the

claim file).  Under these circumstances, that approach to the evidentiary

conflict in the record is neither arbitrary nor capricious.

In short, Pellegrino's challenge to the termination of his LTD benefits boils

down to a contention that Dr. Do Ouro's opinion about, and his own

self-reports of, significant functional limitations necessarily outweigh any

---

[6] There are also two references in the record to where plaintiff reported to First Unum and to PA Gutman that Dr. D'Ambrosio allegedly told him he needed to undergo a hip replacement.  AR at 1678, 1775.  But as with a medical diagnosis, a surgical recommendation does not itself establish a disability.  Instead, question of "disability" under the Plan is concerned with what, if any functional limitations and restrictions flow from the medical condition that requires surgery.

conflicting findings of lesser severity assessed by Dr. D'Ambrosio and generally supported by other substantial evidence in the voluminous record.

That is not the law. "ERISA and the Secretary of Labor's regulations under the Act require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials . . . . [b]ut these measures do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (citations omitted).

"Therefore, when faced with a conflict between the opinion of the treating physician and the opinions of reviewing doctors and independent consultants, it is not arbitrary and capricious for the plan to prefer the reviewing doctors." *Baird*, 2010 WL 3743839, at *10 (citation omitted).  A careful review of the stipulated record confirms that First Unum reasonably resolved the conflict in the evidence in this case by relying in substantial part on the less severe findings of functional limitations articulated by Dr.

D'Ambrosio.[7]  Accordingly, defendant did not act unreasonably in terminating plaintiff's LTD benefits.

## VI.  CONCLUSION

First Unum's decision to terminate Pellegrino's LTD benefits was a reasonable decision supported by substantial evidence.  The Court has considered plaintiff's remaining arguments and finds them to be without merit.

Therefore, it is

ORDERED that

The Clerk of the Court shall enter a judgment in favor of First Unum, terminate the pending motions, and close the file.

IT IS SO ORDERED.

Dated:  August 31, 2021
         Utica, New York.

David N. Hurd
U.S. District Judge

---

[7]  Notably, Dr. Schwartz concluded, and Dr. Hauser concurred, that even after his initial injury Pellegrino retained the capacity for "sedentary" work, and the 2019 vocational review confirmed that plaintiff was "reasonably fitted by education, training or experience" to perform work as a help desk analyst or help desk representative.  In other words, even if plaintiff remained too limited to perform "light" work, he would still be unlikely to satisfy the more demanding definition of "disabled" that applied after the initial twenty-four month period of LTD payments.